(89 App. Div. 569.)

### HERZOG v. MUNICIPAL ELECTRIC LIGHT CO.

(Supreme Court, Appellate Division, First Department. January 8, 1904.)

1. NEGLIGENCE—ELECTRICITY—WIRING BUILDING—CARE REQUIRED.
    In an action for damages sustained by the loss of a building alleged to
    have been destroyed by fire communicated by electric wires negligently
    placed in the building by defendant under a contract to wire the build-
    ing for electric lighting, made several years before the fire, defendant
    was liable only for the exercise of ordinary care and prudence as exer-
    cised by persons engaged in the same business, according to the state
    of the art and methods generally used at the time the work was done.
2. SAME—EVIDENCE.
    In an action for the loss of a building destroyed by fire alleged to
    have been communicated by electric wires placed in the building by de-
    fendant, evidence that defendant used single instead of double cap
    molding to sustain the wires on the ceiling of the upper story, where the
    wires were liable to be affected by moisture, held insufficient to establish
    defendant's negligence in wiring the building.
    Hatch, J., dissenting.

Appeal from Trial Term, New York County.

Action by Paul M. Herzog, as receiver for the benefit of the cred-
itors of Joseph Ryan, against the Municipal Electric Light Company.
From a judgment in favor of defendant, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, O'BRIEN, IN-
GRAHAM, and McLAUGHLIN, JJ.

Louis Marshall, for appellant.
Paul D. Cravath, for respondent.

INGRAHAM, J.   The plaintiff sues as receiver for the benefit of
creditors of Joseph Ryan, and in the discussion of the question pre-
sented upon this appeal we will designate Joseph Ryan as the plain-
tiff.   The action was brought to recover the damages caused by the
destruction of a building on property of the plaintiff by fire on Jan-
uary 4, 1893.   The complaint alleged that on the 19th day of July,
1892, the defendant agreed to wire the building 1059–61 Broadway,
Brooklyn, for Joseph Ryan, and in consideration of the payment to
it of the sum of $600 agreed to wire the said premises in a good,
proper, careful, and workmanlike manner, and to place upon said
premises the wires and other necessary electric apparatus, so as to
enable the said Ryan to supply the said premises with electric cur-
rent for lighting the 275 16-candle power lamps which the said de-
fendant agreed to place upon said premises, and said defendant fur-

ther agreed that it would place upon said premises such wires and other apparatus as would enable the said Ryan to introduce upon his premises a supply of electricity for lighting the same with entire safety, and that such wires and apparatus would be properly insulated and inspected by said defendant, so as to render the use thereof by said Ryan and the transmission of electricity by means thereof free from danger to the said Ryan and to his premises and the goods therein contained; that, "in violation of its aforesaid agreement, said defendant so carelessly, negligently, and unskillfully wired the said premises, and installed therein the said lamps; that by reason thereof, and without negligence on the part of said Joseph Ryan, the buildings and premises owned and occupied by the said Joseph Ryan, together with the stock of merchandise belonging to and owned by him, contained therein, were on or about the 4th day of January, 1893, set on fire and completely lost and destroyed."

The answer denies that the contract between Ryan and the defendant was correctly alleged; alleges that the only contract or agreement between Ryan and the defendant was contained in a written agreement consisting of two written instruments, copies of which are annexed to the answer. It admits that the defendant undertook to wire the premises, and to install therein the 275 16-candle power lamps, as provided in the said agreement annexed to the answer, and denies the other allegations of the complaint to which attention has been called. The two writings annexed to the answer are dated July 19, 1892. One is a request to the defendant corporation, signed by Ryan, to connect the main line with and supply the electric current for 275 16-candle power incandescent lamps upon the premises Nos. 1059–1061 Broadway, Brooklyn, for which Ryan agreed to pay current electric rates. The other, dated the same day, is the order set out in the complaint.

The case has been three times tried. On the first trial the complaint was dismissed, the trial court holding that a clause in the contract which was annexed to the answer was a defense to the action. That dismissal was reversed by this court, the court holding that the question whether both contracts annexed to the complaint were one contract was a question for the jury. 9 App. Div. 573, 41 N. Y. Supp. 692. Upon the second trial that question was submitted to the jury, who found a verdict for the defendant. The judgment entered upon that verdict was reversed, and a new trial ordered, upon the ground that the evidence did not justify a finding that the conditions contained in this contract had been complied with so that the defendant was relieved from responsibility. 39 App. Div. 490, 57 N. Y. Supp. 225. Upon the third trial one issue was presented, and that was as to the negligence of the defendant. At the end of the case the defendant made a motion to dismiss the complaint, and to direct a verdict for the defendant. The court submitted to the jury four questions. The first question was, "Was the defendant guilty of negligence in August, 1892, in using single cap molding to put up the electric wires upon the ceiling of the upper story of the building leased by Joseph Ryan, and known as No. 1065 Broadway, in the city of Brooklyn, as the business of electric wiring was then

ordinarily practiced and understood by those conversant with the art?" That question was answered in the affirmative. The second question was, "If the defendant was guilty of negligence, was such negligence the proximate cause of the fire of January 4, 1893?" This question was answered in the affirmative. Third, "Were Ryan or any of his employés guilty of negligence which contributed in any degree, directly or indirectly, to cause such fire?" This question the jury answered in the negative. And, fourth, "What was the amount of damage suffered by Ryan by reason of the fire?" The jury answered $150,000, whereupon it was stipulated by the parties that "the jury be discharged, and that the May term of court be deemed continued and that the argument upon the pending motions be made upon a day agreed upon, and that after such arguments the court might pass upon questions involved, and if necessary direct a general verdict to be entered in favor of the plaintiff as if the jury were actually in court, and with the same force and effect." These questions were subsequently argued, whereupon the court rendered its decision dismissing the complaint upon the whole case. The plaintiff's motion to direct a general verdict for the plaintiff was denied, and judgment was entered dismissing the complaint, and from that judgment the plaintiff appeals.

The court below dismissed the complaint upon the ground that the evidence was not sufficient to sustain the special finding of the jury that the defendant was guilty of negligence in August, 1892, in using single cap molding to put up the electric wires upon the ceiling of the upper story of the building as the business of electric wiring was then ordinarily practiced and understood by those conversant with the art, and upon this appeal we have to determine the correctness of this conclusion. The undisputed facts are that the roof upon the plaintiff's building was completed in June, 1892; that the contract for the electric wiring was made on July 19, 1892; that the defendant's work under this contract was completed in August, 1892, when the electric wiring and equipment were inspected by inspectors of the New York Board of Fire Underwriters, and approved by them on August 19, 1892; that the electric current was used for lighting the building about September 10, 1892; that in the middle of November, 1892, there was a leak in the roof of the plaintiff's building, which was repaired; that some time in December, 1892, another leak was discovered; that on January 1, 1893, there was a severe storm, during which the roof of the plaintiff's building again leaked, and on January 4, 1893, a fire broke out on the top floor of the building, which started in the neighborhood of the wires installed by the defendant, and which resulted in the destruction of the building. There was evidence to sustain a finding that this fire was caused by these electric wires installed by the defendant, and the jury have so found. The question in dispute is whether there was evidence to sustain the finding that the defendant was negligent in installing these electric wires. It must not be lost sight of that we are determining a question which depends upon negligence in July and August, 1892. It would be manifestly improper to charge the defendant with a knowledge which has been gained by experience subsequent to the time when this work was done. The question that

was submitted to the jury, to which no objection was made by the parties, was whether the defendant was guilty of negligence in August, 1892, in using single cap molding to put up the electric wires, as the business of electric wiring was then ordinarily practiced and understood by those conversant with the art. We must also bear in mind that it was the plaintiff who had constructed the roof of the building in which these wires were placed; that the roof was new, and apparently water tight, and up to the time when the contract was made and these wires installed it had shown no signs of leaking; that this roof was under the control of the plaintiff, and upon him was the obligation to keep it in such a condition as would protect the interior of the building and the wires placed in it by the defendant; and that the defendant was justified in assuming that this duty would be performed, and that the roof would prove to be capable of keeping out the water. The current was turned on the building, and this electric equipment was used from September 10, 1892, until the date of the fire, on January 4, 1893. What it was that caused this electric appliance to give out on the night of January 4th is involved in considerable doubt. The rain which caused the leak was on January 1st. The building was used on each of the succeeding days, and the electric lights were in constant use during that period. From January 2d to January 4th it was extremely cold, the temperature being all the time below the freezing point, so that there could be no additional leak after the 1st of January. During this period the building was heated, and it would seem that any moisture that came on the inside of the building on January 1st would have dried up long before the time of the fire, on January 4th. The fact that this wiring was in use on January 2d, immediately after the rain, when the walls were wet in consequence of this leak, without the slightest indication that the insulation was defective, renders it improbable that the leak on January 1st affected the insulation of the wires so that it set fire to the building on January 4th, and this is material when we come to consider the method adopted from which the plaintiff's witnesses seek to adduce evidence of negligence on the part of the defendant.

In connection with the method adopted by the defendant, the plaintiff testified that he told the defendant's agent that he wanted this wiring done as cheap as he could get it. Hogan, the agent, testified (and this was not disputed by the plaintiff) that his first estimate for doing the work was $650; that the plaintiff objected to that price, and offered $600, which was finally accepted. The plaintiff also testified that in the middle of November there was quite an extensive leak which appeared on the ceiling in the building in which the fire was discovered, at the rear of the skylight, and running along towards the front of the building; that there was a discoloration on the ceiling all the way from the rear end of the skylight down through the passageway; that the molding which covered these electric wires was right over this discoloration; that the discoloration was around and on both sides of this molding and under it; that it was quite a large leak, and the plaintiff had to take up pails and buckets and set them around the floor and spread sawdust on the floor to keep the water from going down to the next floor; that altogether a half barrel of

water came down through the leak; yet during all the time that the walls were wet from this leak these electric lights were used, with no indication that there was anything defective in the insulation, or that dampness of the walls had affected the lighting equipment. The second leak in December also appeared to have affected the same part of the roof.

We now come to the evidence offered by the plaintiff to sustain his allegation that the defendant in adopting the method that it did was guilty of negligence; and in determining this question, of course, we must assume that the evidence offered by the plaintiff was accepted by the jury. The method adopted by the defendant was described by the plaintiff's witnesses as "single electrical wiring." The wire used by the defendant was a copper wire, tinned, covered with a coating of rubber, and on top of the rubber a linen tape saturated with rubber. These wires were placed along the ceiling, and covered by a single cap molding, which was of wood, with receptacles in which the wire was placed, and the molding was then nailed to the ceiling of the room; that the wire in general use at that time was subject to abrasion where the insulation cracked; that if there was a break in the insulating material, and there is moisture or metallic contact between the wire and some outside object or substance, there was danger of a leak of the electricity. There was in use for interior wiring at the time what was called double and single cap molding. The double cap molding consists of a strip of wood with a groove in which the wires are laid, and covered by a cap that was nailed on to keep the wires in place. In the single cap molding the groove is in the molding, and this molding is nailed to the ceiling; the difference being that in the double cap molding there was wood between the wire and the ceiling and in the other there was not. The experts called by the plaintiff testified that in their opinion it was not a safe, proper, and workmanlike method of construction on the top floor of a building immediately under the roof to use a single cap molding, because that form of construction was liable to retain any moisture that would leak through the roof, and that holding moisture in a single cap molding containing wires attached to these appliances would render it liable to cause fire, because of the escape of electricity.

Upon cross-examination of the plaintiff's witnesses it appeared that incandescent lighting was first used in New York in 1880 or 1881; that the art of electric lighting from that time on has been a progressive art, and from time to time improvements and changes have been introduced; that during this period in which electric lights have been progressing there have been different opinions held by electricians as to the methods in which wiring should be put up and currents applied and the lighting done, and there has been a good deal of dispute and controversy on these subjects; that single cap molding was in use in New York and in Brooklyn in 1892, and very frequently used; that up to and including July, 1892, the witness knew of but one fire, which was at 848 Broadway, New York, caused by an alternating current, where the wires were supported by a molding against a wooden ceiling; that he was not certain whether that fire was before or after July, 1892; that this single cap molding was used

on the ceiling of the Fifth Avenue Hotel where electricity was installed in the year 1892, that work being done under the supervision of one of the witnesses for plaintiff; that the roof of the Fifth Avenue Hotel was, at the time when that wiring was put on, a tar gravel roof laid upon felt, like the roof of the plaintiff's building; that these moldings in the Fifth Avenue Hotel have remained there ever since, not having been touched; that this work at the Fifth Avenue Hotel was done under the direction of Mr. William H. Brown, the general manager of the company, in whose employ the witness then was, a man of large experience at the time, and a very able man.   A witness who was an electrical engineer and contractor, and the general superintendent of the Complete Construction Company of New York, from the latter part of 1888 until the latter part of 1893, testified that he was familiar in July, 1892, and before that time, with the work of electrical wiring for buildings for the use of electricity in Brooklyn and New York, and the method which was in general use by electricians; that he was familiar with the single cap molding of the character which was shown to have been used in the plaintiff's building; that in July, 1892, it was not good, proper, safe, and workmanlike construction to use a single cap molding for the purpose of holding in place the wires which were laid against the wall immediately under the roof of a building in this vicinity; that if there was any liability of moisture these wires should be placed in porcelain, and if there was no liability of moisture they should be placed in double cap molding.   On cross-examination the witness testified that in 1892 he was also engaged in wiring the Fifth Avenue Hotel, and that he used single cap molding on the job; that all the work then done remained in the same condition to the time of the trial; that single cap molding had been discarded at that time generally.   Another witness, an electrician, who had been employed by the Edison Electric Illuminating Company from 1889 to 1892, was called by the plaintiff, and testified that he was acquainted with the different methods in general vogue among competent electricians for wiring buildings for electricity in July, 1892, and this vicinity; that it was not the practice in July, 1892, to use single cap molding for the purpose of holding in place wires which were laid against the ceiling immediately under the roof of a building, and that it was not a safe construction; that it was not safe, because there was a risk of fire being caused through some action of the current in contact with abrasions of the wire and moisture.   Another electrical engineer was called by the plaintiff, who testified that he was acquainted with the method of electrical wiring which was in vogue generally among electricians in July, 1892; that in view of the art of electrical wiring as it existed in July, 1892, this method for the purpose of holding wires in position on a ceiling immediately under a roof was not good, proper, safe, and workmanlike construction, for the reason that a molding placed in that position for the grooves upward would tend to retain moisture that might come through the roof, and therefore tend to produce leaks between the wires.   Upon cross-examination he testified that there had been during the progress of the art of electric wiring a considerable variety of opinions among electricians as to the various appliances used in electrical equipment; that the matter had been the

subject of continual experiment and improvement; that, as to the method of putting up wire, there has been considerable discussion and diversity of opinion, but that the methods that were in vogue in 1890 were still in vogue and considered good; that the single cap molding was in vogue in 1890, and that the double cap molding came in very soon after that; that the witness lived in Connecticut from 1887 to 1893, and did not have during those years any extensive experience in regard to the methods of putting up electric wiring equipments in New York or Brooklyn.

I have thus detailed the evidence offered by the plaintiff upon which this verdict of the jury was based, and, with the single exception of the statement of one witness that single cap molding had gone out of use in 1892, there is no evidence to show that this method adopted by the defendant was not one in general use at the time this contract was made, or was then considered an improper method. We have the opinion of several witnesses that it was not a proper method, and dangerous, if the grooves in the molding became filled with water; but this is based entirely upon the opinions of these witnesses, in face of the fact that this method was at the time mentioned in use for purposes of this character.

On behalf of the defendant it was proved that the wire used for wiring this building was what is known as "Bishop's White Core Rubber Covered Wire," described by the plaintiff's witnesses as being the best wire in use. The superintendent of the defendant, who had been such superintendent up to the year 1899, when he was employed in the same capacity by the Edison Company, testified that, in accordance with the practice in vogue in the summer of 1892, there was no distinction drawn with reference to the use of the single cap molding or double cap molding between the ceiling of top stories and the ceiling of other stories in buildings; that during all his experience he never knew of a fire originating underneath a molding, where the alternating current was used; that double cap molding at that time was occasionally used, but had not come into general use. The inspector of the board of fire underwriters testified that he had been inspecting electric wiring for the board of fire underwriters for upwards of 10 years; that in the summer of 1892 he had made frequent inspections of electric wiring installation in New York and Brooklyn for the board of fire underwriters; that he inspected the wiring electrical appliance on the premises of the plaintiff; that he inspected the method by which the wires were put on the walls and ceilings; that he saw the kind of molding that was put up, and saw the place where it was put up; that he was acquainted with this single cap molding, and that it was universally used on the ceiling in dry places; that at that time it was used also on top ceilings as well as other parts of buildings; that they did not discriminate between the tops and other parts of buildings; that this molding was such as was used for electrical wiring in the summer of 1892. Several witnesses who were experts were called for the defendant, and testified that in the summer of 1892 single cap molding was generally in use in Brooklyn and in New York; that double cap molding, or molding sometimes called "box molding," had not come into extensive use in the summer of

1892, for branch circuits; that wiring men generally used single cap molding; that single cap moldings on ceilings on top stories was generally proper practice at that time, and many buildings were detailed by the witnesses for the defendant which were wired for electric lighting about this time, and in which this method adopted in the plaintiff's building was employed. There was also evidence of the defendant that double cap molding subsequently superseded the single cap molding because of the fact that the board of fire underwriters prohibited single cap molding, but this was some time after 1892. The evidence as to the buildings that had been wired by the same methods adopted by the defendant about the year 1892, or just prior thereto, in New York, was uncontradicted by the plaintiff, and the great mass of expert testimony, I think, conclusively established that fact. In fact, it may be said that the evidence is almost uncontradicted that at this time the single cap molding was in extensive use for the installation of this character of electric lighting; that no fire had ever been caused by the use of such molding; and, while certain electrical experts considered it dangerous, it was the method usually adopted for wiring buildings.

We have, as the evidence upon which the plaintiff seeks to establish negligence, the testimony of four persons, who were connected with the installation of electrical wiring in New York in 1892, that in their opinion this method adopted by the defendant was dangerous and unsuitable. We have, on the other hand, testimony specifying buildings and instances in which this method was adopted. We have the uncontradicted evidence that with one exception, the date of which is not fixed, no fire had ever occurred in consequence of the adoption of such a method as that used by the defendant, and the fact, which may be said to be undisputed by any substantial evidence, that this was the method generally in use. It is evident that any verdict of the jury that the adoption of this method was negligent would be clearly against the weight of evidence, and should not be allowed to stand.

The question, further, is whether it can be said that there was no evidence to show negligence, so that the court was justified in dismissing the complaint. It is proper to call attention to the fact that there is no evidence to show that improper materials were used. The evidence is substantially undisputed that the wiring and molding used were of the proper character and of the kind generally in use, the sole criticism upon the defendant's method being that this single cap molding was used. In fact that a piece of wire produced, which was taken from the wiring used in a stable by this defendant company, is no evidence that such wire was used in the building in question. The statement of the plaintiff, who had no experience with electric wiring, that the piece of wire produced was of the same character as the wire used in this building, is completely overcome by the testimony as to the character of the wire used, and it is conceded by all of the witnesses that the wire specified by the defendant's witnesses as used in the building was of the best character and proper for the purpose.

The rule of law applicable to a question of this kind is not in substantial dispute. The defendant was employed to wire the plaintiff's house for the purpose of electric lighting. It accepted such em-

ployment, and undertook to do the work. It assumed no obligation to furnish the best materials or the best method. It did not insure that the wires when used would continue for any definite or indefinite period to safely transmit the electric current ·to all the building. What it undertook to do was to use the care and skill ordinarily used by those engaged in furnishing these appliances, and it is only for a neglect to perform this duty that it can be held liable. The workmen that were employed, so far as appears, were competent men to do the work.. The materials that were employed were·proper materials for the purpose. The method employed, including this molding, was that in general use at the time, employed in a large number of buildings, which are specified in the evidence. It is true that several experts considered that the method was not safe; but a much larger number of experts considered that it was a safe and proper method at the time it was applied, and was so considered by those engaged in the business of wiring for the use of electricity. The work was finished in August, and the electricity was turned on about the 10th of September, and its use continued for nearly four months without disclosing any defect, although both in November and December there had been a leak in the roof which had discolored the wall along which this wire was carried. There was no evidence that at the time this work was done the roof had ever leaked, or that there was any reason to anticipate that the roof would leak and make the ceiling of the building damp, so that the method adopted would be dangerous or improper; and there is no evidence that an electric wire used to carry on alternating current had ever set fire to a building when installed in the manner adopted by the defendant. The defendant might have adopted a method which subsequent experience had shown would be safer than that adopted, but the defendant was not chargeable with the knowledge that had been acquired by experience with electricity after the work was done. The utmost that could be said from the evidence was that the method that should be adopted in doing· such work was a matter about which experts differed, and that the defendant adopted a method which was approved by a majority of those having expert knowledge upon the subject. The obligation assumed by the defendant was not different from.that assumed by a physician or surgeon called in to attend a patient who needed professional advice.

In Pike v. Honsinger, 155 N. Y. 201, 49 N. E. 760, 63 Am. St. Rep. 655, the Court of Appeals say:·

"The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and, to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result. * * * The rule requiring him to use his best judgment does not hold him liable for a mere error of judgment, provided he does what he thinks is best after careful examination."

This same general principle has been applied in cases where the plaintiff's property was destroyed by fire in consequence of an explosion, or a fire happening upon adjoining premises in possession of the defendant. In Cosulich v. S. O. Co., 122 N. Y. 118, 25 N. E. 259,

19 Am. St. Rep. 475, the obligation of a person in the use of his property, as affecting the property adjoining, is stated as follows:

"The defendant was not maintaining a nuisance. Its business was lawful, and in its conduct the law does not impose the obligation of saving harmless others from the consequences resulting from the occurrence of inevitable accident, but rather burdens it simply with the duty of using reasonable care and caution to save others from injury. If it omitted that duty, and failed to observe that ordinary care which was incumbent upon it, then, because of such neglect, it became legally chargeable with the damages directly resulting therefrom, but not otherwise. As the existence of negligence is an affirmative fact, to be established by him who alleges it as a foundation of his right of recovery, it was incumbent upon the plaintiffs to point out by evidence the defendant's fault, for the presumption is, until the contrary appears, that every man has performed his duty."

The same rule is applicable where an employé has been injured by machinery or appliances furnished by his employer. In Harley v. B. C. M. Co., 142 N. Y. 31, 36 N. E. 813, this obligation upon the master is stated as follows:

"The master does not guaranty the safety of his servants. He is not bound to furnish them an absolutely safe place to work in, but is bound simply to use reasonable care and prudence in providing such a place. He is not bound to furnish the best known appliances, but only such as are reasonably fit and safe. He satisfies the requirements of the law if in the selection of machinery and appliances he uses that degree of care which a man of ordinary prudence would use, having regard to his own safety, if he were supplying them for his own personal use. It is culpable negligence which makes the master liable, not a mere error of judgment."

In Reiss v. N. Y. S. Co., 128 N. Y. 103, 28 N. E. 24, the same rule was applied in a case much like the present, where the defendant was employed to supply steam by means of a connection in its basement with the mains or pipes under the street, and a system of pipes, valves, and meters set up by it in the basement of the plaintiffs' building. The defendant's mechanics put in and adjusted the apparatus in the latter part of June, 1887, and had finished it on Saturday, July 2d. A few days after, when the appliances were first used, a valve was blown off, and steam escaped into the basement, doing damage to the plaintiffs' goods, for which they sought to recover. The plaintiffs claimed that this valve blew out because the screw by which it was fastened into the valve was too small, and that, therefore, the threads of the screw did not hold; and in holding the defendant not liable the court say:

"If this was the defect, there is no proof that any ordinary care ought to have discovered it. The bonnet and the valve were made by competent manufacturers, and had been properly tested by them, and the defendant had no reason to expect such an imperfection. When the steam was let on, the 2d day of July, the bonnet and valve proved adequate, and there was no indication from the examination then made of any imperfection or weakness therein, and they were able to stand the pressure to which they were subjected until the time of the explosion, on the 5th day of July. One or two witnesses gave opinions that if the screw had been large enough it would not probably have blown out; but there is considerable other evidence from witnesses shown to be competent to speak upon the subject that, by the formation of what is called a water ram, the bonnet would have been pressed out, even if the screw had been large enough to fit closely and compactly into the valve, and that the pressure would cause an expansion of the nut or valve into which the screw passed, so that it could be blown out without in-

juring the thread. The accident was a very unusual one, which had never before happened in the business of the defendant, and it was not bound to anticipate or guard against."

And it was held that there was no evidence of negligence which justified the court in submitting the question of the defendant's liability to the jury.

In German Am. Ins. Co. v. Standard Gaslight Co., 67 App. Div. 339, 73 N. Y. Supp. 973, we sustained a judgment for the plaintiff where a workman employed by the defendant had been engaged in performing the work that the defendant was employed to do, and thereby caused injury to the plaintiff's property; but this was based solely upon the negligent act of the defendant in applying a match to locate a leak in the gas pipe in immediate proximity to inflammable material—a very different question from that presented where the negligence charged is in selecting a method of installation of electric wiring, where the most that can be said is that there was a difference of opinion among electricians and experts as to the best method of doing the work, and where the defendant adopted one of the methods then in general use, and which was approved by experts skilled in the art.

Applying the rule that obtains in all cases where a defendant is sought to be charged with negligence, we think that the evidence was not sufficient to justify a finding of negligence; that the most that can be said is that the defendant adopted a method which some experts engaged in the business considered to be unsafe, but other experts who were equally competent to judge considered safe, and which was in general use at that time; and that, if a mistake was made, it was an error of judgment, and not negligence. Taking this view of the case, we think the court below was clearly right in dismissing the complaint, and the judgment appealed from should be affirmed, with costs. All concur, except HATCH, J., who dissents.