## McMULLEN v. CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. May 5, 1905.)

1. NEGLIGENCE—EVIDENCE—OPINIONS OF EXPERTS.

The fact that a particular expert considers the method adopted for fastening a wire rope in a socket unsafe or improper is not sufficient to sustain a finding of negligence in the adoption of such method, where other experts consider the same safe and proper.

2. SAME—DUTIES TOWARDS STRANGERS.

A city which engages a contractor to deliver sand to it is under no obligation to a servant of the contractor, except the obligation that every one is under to a person lawfully upon or adjacent to his premises— to use the care of an ordinary person to avoid injuring him.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 1241–1243.]

3. SAME—UNFORESEEN ACCIDENTS.

Plaintiff was employed by a contractor who was engaged in delivering sand to a city. The sand was shoveled into tubs by plaintiff and other servants of the contractor, and the tubs were hoisted by derricks by employés of the city. One morning the wire rope used in hoisting a tub slipped from its socket, and plaintiff was injured. Such an injury had never been known to occur before. The city had employed competent en-

gineers to properly fasten the rope in the socket, and those engineers had constantly examined and inspected the appliance, and had in fact examined it on the morning of the accident, when the only thing irregular was that the strands of the rope had become untwisted. This condition, however, had nothing to do with the accident. *Held*, that there was no negligence on the part of the city for which it could be held liable to plaintiff.

Laughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by William McMullen against the city of New York. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Theodore Connoly, for appellant.
Stillman F. Kneeland, for respondent.

INGRAHAM, J. The plaintiff was in the employ of Murray & Co., who had a contract with the city of New York to deliver sand to the city. The contract provided that:

"The sand required to be delivered at the West Fifty-Seventh Street or at the East Twenty-Fourth Street yard will be shovelled into tubs to be furnished by the Department of Docks and Ferries, by the furnisher, and the tubs will be tended and dumped by the furnisher. The Department of Docks and Ferries will hoist the sand from the deck of the vessel, or scows to the height required to dump the tubs into a car, which will be trammed and dumped by the furnisher in the bins on the pier at West Fifty-Seventh Street or at East Twenty-Fifth Street, as directed by the Engineer."

Under this contract Murray & Co. on December 17, 1900, were engaged in delivering sand at the East Twenty-Fourth street yard. The sand was shoveled by employés of Murray & Co., of whom plaintiff was one, into tubs furnished by the department of docks. The department of docks then hoisted the tubs from the vessel to the height required to dump the tubs into cars. The dock department had installed upon the East Twenty-Fifth street dock a derrick for hoisting the sand from the hold of the vessel. This consisted of an upright mast, to which was attached a boom extending out over the water. To this there was attached a wire rope running on a pulley at the end of the boom, which was fastened in a socket to which was attached a hook. The method of attaching this rope to the socket was to put the rope through the socket, separate the strands, and pour in melted lead. This rope had been leaded into the socket on March 26, 1900, prior to the accident on December 17, 1900. The rope had been tested up to a strain of 18,100 pounds, and a rope of this character would stand a strain of about 26,000 pounds. The weight of a tub of sand was 1,300 pounds. Lead sockets of this kind had been used in the department for upwards of nine years, and no accident had ever happened. None of the sockets had ever pulled out, and none of the witnesses testified that they had ever known of a socket leaded as this was to pull out. This rope had been leaded into this socket by an

engineer in the department of docks, who described the method as follows:

"The rope is put through the socket about two inches. It is then put in the furnace and heated. The wires of the different strands of the rope are then untwisted and opened out thoroughly. Then melted lead is poured into the socket until it is flush with the collar, and when it cools the connection is made."

There was evidence that on the 5th of December, before the accident, the captain of the schooner who had charge of the guy rope attached to this tub called the engineer's attention to the rope just above the socket, which appeared as if, from the twisting of the rope, it had gotten out of the socket, and asked the engineer if it would not be a good idea to cut the end of it off and relead it. The engineer called this to the attention of the chief engineer in charge of the work, and asked if it would not be a good idea to relead the rope; but the chief engineer said that it was not necessary, as it would become untwisted from the constant use; that the manufacturers of the rope had guarantied it to lift six or seven tons, and that one strand of the rope would hoist a tub of sand. The chief engineer testified that he examined this rope the morning on which the accident occurred; that about four inches above the socket the rope was a little bit out of strand (that is, the strand was a little loose—unraveled a bit); that the lead was not loose in the socket, and when he examined the rope he found everything all right, only the rope had become untwisted about four inches above the socket. It does not seem to have been suggested by any one that there was any danger of the rope pulling out of the socket. The only question was as to whether unraveling the rope would weaken it so that it would break, and, as one strand of the rope was sufficient to bear the strain of lifting one of these buckets full of sand, it was not considered that there was any danger of the rope breaking, and, as a matter of fact, the rope did not break; the accident being occasioned by its being pulled out of the socket. A witness was called by the plaintiff, and testified as an expert that there were two or three proper methods of inserting a steel rope in such a socket; that one of the methods was to pull the rope through, unravel the ends, drive steel pegs in, and then pour soft molten lead; that another was to insert the rope, and turn the ends up, and drive the ends back into the socket, and then pour in the molten lead. This witness was then shown the end of the steel rope that had pulled out of this socket, which was produced by the defendant, and was asked whether or not they were put in by bending them over, as the witness had described, and the witness said that he should think not; that he did not believe that the ends had been bent over; that it was an unsafe and improper way to put the wire in straight, without any pegs; that a twisting strain would tend to loosen the lead in the socket, and tend to pull the lead out. Upon cross-examination he had testified that he never knew of a case where twisting had pulled a rope through a socket; that he knew that a twisting motion caused more

strain on the rope than a straight pull; that when a rope was properly put in a socket the rope would break first, because the witness had never known one to pull out, but had known ropes to break. The engineer who had fastened the rope in the socket testified that he had been employed by the defendant for upwards of 12 years, and for 9 years had constantly adopted this method, and that it had never been known to pull out, and that it was the usual method adopted in the city of New York; and this was not contradicted. A witness called by the plaintiff had sworn that in his opinion it was not a safe method, but that was simply his individual opinion, and there was no evidence that any one else was of the same opinion. There was no evidence to show that these engineers were not competent men, perfectly familiar with the methods in general use for doing this kind of work; that the best materials were not supplied; or that there was the slightest reason to suppose that a rope and a bucket connected by this method were not perfectly safe, and such as were generally used for the purpose. The plaintiff was not in the employ of the defendant, and the obligation which exists, as between a master and servant, to furnish a servant with proper tools and appliances to do this work, did not exist.

Assuming that the rule as stated in Connors v. Great Northern Elevator Co., 90 App. Div. 311, 85 N. Y. Supp. 644, is correct, and that, although no relation existed between the plaintiff and the defendant, still the defendant would be liable for negligence which resulted in causing a man employed by its contractor an injury, it is not enough to show such negligence that, in the opinion of some expert, the method adopted was not a proper method. The fact that an expert considered that method adopted was not safe or proper, when other experts considered that it was safe and proper, is not sufficient to sustain a finding of negligence. Herzog v. Municipal Electric Light Co., 89 App. Div. 569, 85 N. Y. Supp. 712, affirmed on opinion below 180 N. Y. ——, 72 N. E. 1142; Reiss v. N. Y. S. Co., 128 N. Y. 103, 28 N. E. 24. In Reiss v. N. Y. S. Co., it is said: "The accident was a very unusual one, which had never before happened in the business of the defendant, and it was not bound to anticipate or guard against it." It seems to me quite clear that the adoption of this method of fastening the wire rope in the socket of the hook was not negligence which would sustain an action by the plaintiff against the city of New York.

The question is then presented whether the condition of the rope just before the accident, and which was called to the attention of the engineers, was such that they should have anticipated the accident, and that it was negligence to use the appliance after their attention was called to it. But all that appeared from that inspection was the fact that the strands of the rope had become untwisted. The defendant's engineers, seeing that condition, examined it, and, after such examination, were satisfied that this untwisting of the rope would not affect its strength so as to make it probable or possible that using it to hoist this sand would cause

the rope to break. So far as appears, that was the only condition that called for an examination. It was not suggested that there was any evidence that the rope was liable to pull out of the socket, and all of the experts united in saying that this rope would bear a weight of 26,000 pounds, and that the bucket of sand weighed but little over 1,300 pounds; and their judgment was correct that the rope was in no danger of breaking, because it did not break. We must bear in mind that the defendant was under no obligation to the plaintiff, except the obligation that every one is under to a person lawfully upon or adjacent to his premises to use the care of an ordinary person so as to avoid injuring the other. I do not think there is any evidence here to justify a finding that the defendant failed in this duty. It had employed competent engineers to do the work, upon whom it imposed the duty of properly fastening this rope in this socket. The method that they adopted had been the method in use for many years, and no accident had ever happened. They constantly examined and inspected the appliance, examined it upon the morning of the accident, and, in their best judgment, determined that it was safe. Upon no principle can it be held that the defendant was responsible for the result of an accident which happened because of an unusual condition, that had never before been known to exist, and which the defendant was not bound to anticipate.

If these views are correct, there was no evidence to justify a verdict of negligence against the defendant, and the judgment and order must be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except LAUGHLIN, J., who dissents.